LANE v. LANE.

1. WILLS—CONTRACTS—MENTAL COMPETENCY—DEEDS.

    A disposition of property by deeds and a somewhat complicated will is not sustainable if the testator, at the time of executing the papers had not sufficient judgment and memory to recognize that the papers presented conformed to his previously expressed intention, and embodied the disposition which he had determined upon.[1]

---

[1] As to capacity to make contract as affected by mental conditions, see note to *Sprinkle* v. *Wellborn* (N. C.), 3 L. R. A. (N. S.) 174.

2. SAME—INCOMPETENCY.

Upon a review of the facts as to mental competency, a transfer of property made by one in contemplation of death is not sustained as a valid disposition of the estate of deceased.

Appeal from Lapeer; Smith, J. Submitted February 23, 1910. (Docket No. 24.) Decided March 19, 1910.

Bill by William H. Lane against George A. Lane and others to set aside a deed. From a decree for complainant, defendant Lane appeals. Affirmed.

*Geer, Williams & Halpin*, for complainant.

*B. F. Reed*, for appellant.

BLAIR, J. The bill of complaint in this cause was filed to set aside a deed purporting to have been executed by David A. Lane on April 23, 1908, a few hours before his death. Other deeds and a will were executed at substantially the same time, conveying and devising his property to his brothers and sisters.

On the 20th day of April, 1908, David A. Lane stated to Mr. Hemingway, a justice of the peace and an old friend, that he wished to dispose of his property, and how he wished to dispose of it, and by what papers, and directed him to draw the instruments for his execution. At this time Mr. Lane had been sick for three months and was failing. The papers were not executed till the 23d because of a claim by one McGunegle that there was a flaw in the title of the farm which had been sold to him on land contract April 8th, 1908, by David A. Lane.

"*Q.* That is, the reason of the delay was trying to get a settlement with McGunegle from the 20th of April to the 23d in executing the papers?

"*A.* Yes, sir; I couldn't act without power of attorney in settlement. * * * On the 23d of April, the day these deeds and will were executed, I went there right after dinner, about one o'clock. I was there before that day; I was there all the forenoon nearly. I talked with David during the forenoon, he gave me a power of attor-

ney that day, about eleven o'clock or twelve, he did give me the power of attorney to settle this trouble with McGunegle.   *   *   *   I got the power of attorney in the morning, I got it to settle with Mr. McGunegle.   I didn't have time to settle with him.

"*Q.* How did you happen to go back and make those papers right after dinner ? Did Dr. Watterworth tell you you must make those papers right away if you made them at all ?

"*A.* Yes, sir; he said he was perfectly competent.   He told me that in the road between my house and this.   He didn't come there on purpose to tell me to make those papers if I was going to.   That is the reason I did not settle with McGunegle or try to settle with him after I got the power of attorney; because he was failing so rapidly I thought I must do it right away or not at all.   I wasn't a great while preparing those papers, perhaps an hour, something about two o'clock when they were signed."

On May 16, 1908, Mr. Hemingway, at the request of counsel for complainant, signed the following written statement relative to his instructions from David A. Lane:

"April 20, 1908.

" David Lane's statement.

" Deed Stark house and lot to Maria Larkin.

" Deed yellow house and lot to Nancy Tower.

" Deed the farm to George Lane.

" Will from the mortgages to Will Lane and sister Mary Reynolds, $500.00 each.

" James T. Lane, $5.00.

" At the time this statement was made he asked me to prepare these papers at once.   He said if he lived I was to return them and if he died I was to pass them to the parties to whom they belonged.   He never at any other time gave me any directions as to what I should do with the papers.   When the papers were made I took them and delivered them after his death under these directions.

[Signed]        " I. L. Hemingway.

" Dated May 16, 1908."

Mr. Hemingway testified on the present hearing:

"David A. Lane never said anything to me about delivering this deed on the 23d, or at any other time.   On

the 20th I said to Mr. Lane, 'If you recover I will return these deeds,' and he said, 'Isaac, I shall never get well;' and that was all that was ever said about that.  He did not assent to the statement that I made that I would return the deed made on the 20th.  \* \* \* I didn't tell Mr. Halpin that David Lane used that language.  I think Mr. Halpin was careful to ask me just what was said about the delivery of the papers.  I couldn't say whether he asked me what David Lane said about them—the delivery.  I did not understand, on May 16th, when I signed this statement prepared by Mr. Halpin, that it contained the exact language that was used between David Lane and me on April 20th, when he gave me a statement and directions how to dispose of his property.

"*Q.* Mr. Hemingway, you say that the language that was used at that time you stated to David Lane, that if he got well you would return these papers to him.

"*A.* I said that, yes, sir; and David Lane said, ' Isaac, I will never get well;' that was the language.  He gave himself no directions as to what should be done with the papers.  He left it to me after he told me how he wanted to dispose of his property to arrange the different deeds and will according to my own idea.  And I made this will and the three deeds to carry out these directions that he wanted to dispose of his property to arrange the different deeds and will according to my own idea.  And I made this will and the three deeds to carry out these directions that he gave me on the 20th."

The circuit judge, being of the opinion that the case was somewhat like the case of *Blackmore* v. *Thompson,* 149 Mich. 693 (113 N. W. 307), held that Mr. Lane was mentally competent to execute the papers, saying:

"Physically Lane was either a little nearer the stupor immediately preceding death than was Dickerson or else was under the influence of an opiate.  At that hour Lane was clearly not in mental or physical condition to have planned a full disposition of his property and keep in mind all the necessary legal requirements, nor to have directed the details.  But like Dickerson he had considered the disposition of his property for a considerable time before, especially the giving of the farm finally to his brother George, and had planned and dictated on the 20th and 21st, when he was in the full possession of all

his mental powers, a full disposition of his property, except in a few matters of minor importance which he had left purposely to the discretion of the justice.

"Justice Hemingway having correctly carried out the instructions, there was really nothing for Lane to do but sign or have signed for him the papers creating a disposition of the property previously settled. I think he comprehended this was being done for him."

Being of the opinion, however, that there was not a sufficient delivery of the deeds to transfer the title, a decree was entered for complainant, from which the defendant George Lane has appealed to this court.

Previous decisions are of little assistance in determining the question of mental competency, and each case must be determined upon its own facts. The testimony is in conflict upon this question, and after a careful consideration of the testimony of the opposing witnesses we have come to the conclusion that the evidence against mental competency clearly preponderates over the evidence in its support. We do not think that mental competency is established by proof that a grantor had sufficient intellect left to understand that he was signing certain papers and that previously he had requested the person presenting the papers to prepare papers for him. Undoubtedly, the fact that a grantor or testator has fully considered the disposition he wishes to make of his property when of sound mind and has settled upon the disposition which he will make is to be considered in determining his competency to execute the necessary papers to carry such disposition into effect. It would require less strength of mind to take up and consider a previously settled plan than to take up the subject *de novo*. But the mind must still possess sufficient judgment and active memory to recognize that the papers presented are in pursuance of his previous determination and actually embody the disposition of his property which it was then his intention they should. In the case of *Blackmore* v. *Thompson, supra,* we were of the opinion that the testimony which we credited showed that

Mr. Dickerson had a sufficiently active mind and memory to support his execution of a single deed of his property. In this case we are of the opinion that the testimony to which we give credit demonstrates that Mr. Lane did not possess a sufficiently active mind and memory to validate the deed made in connection with other deeds and a will involving some complications.

The decree is affirmed, with costs to complainant.

MONTGOMERY, C. J., and OSTRANDER, HOOKER, and STONE, JJ., concurred.